J-S15016-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INT OF: A.B., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.B. AND M.B., PARENTS | No. 1580 MDA 2014 |

Appeal from the Order Entered on August 14, 2014
In the Court of Common Pleas of Mifflin County
Orphans' Court at No.: 6 of 2014

BEFORE:  LAZARUS, J., WECHT, J., and JENKINS, J.

MEMORANDUM BY WECHT, J.:                    **FILED MARCH 06, 2015**

L.B. ("Father") and M.B. ("Mother") (collectively, "Parents") appeal the August 14, 2014 order that terminated their parental rights to their son, A.B., born in August 2003.  After careful review, we affirm.

The family came to the attention of the Mifflin County Children and Youth Social Services ("the Agency") in May 2009, when Father filed a petition for a Protection from Abuse ("PFA") order against Mother. Dependency Order, Findings of Fact, 7/8/2010, at ¶1.  The Agency closed and/or re-opened the family's case in June 2009, July 2009, September 2009, and April 2010 due to various allegations of abuse by both Mother and Father.  *Id.* at ¶¶8-18.  In June 2010, the Agency received another referral that alleged that both Mother and Father were physically abusing A.B. and his older sibling, T.B.  *Id.* at ¶¶29-33.  The Agency developed a safety plan and the children were placed with a paternal aunt.  *Id.* at ¶34.  However,

the aunt told the Agency that she was unable to care for the children. *Id.* at ¶35.

The trial court made the following findings of fact:

By Voluntary Placement Agreement executed by both Mother and Father, dated June 11, 2010, A.B. was temporarily placed in foster care by the Agency. On June 20, 2010, the Agency filed a Petition alleging A.B. to be dependent as a result of overall instability in the home, domestic violence, a history of [PFA] actions, and lack of proper parenting. On July 3, 2010, [Family Intervention Crisis Services ("FICS")] Family Preservation Services [began working] with the family. On July 8, 2010, after a dependency hearing, the court adjudicated A.B. dependent with disposition of legal custody with the Agency and physical custody with Mother and Father. On April 4, 2011, A.B.'s older sibling, T.B., was temporarily placed by the Agency pursuant to a Voluntary Placement Agreement executed by Mother and Father. On May 5, 2011, the court modified the older sibling's disposition in that he was removed from Mother's and Father's custody and placed in the physical custody of the Agency. On September 3, 2011, FICS Family Preservation Services was permitted to close their case due to Mother and Father not making any progress. On December 13, 2012, A.B. was removed from the physical custody of Mother and Father and physical custody was placed with the Agency as a result of Mother's and Father's minimal progress toward alleviating the circumstances which necessitated the original placement of A.B. On December 18, 2012, FICS Reunification Unit opened services. On June 12, 2013, FICS Reunification closed services because there had been a lack of progress by Mother and Father. After FICS Reunification Services closed their services with the family, supervision was returned to the Agency. From approximately May 2013 through September 2013, visits were offered two hours weekly in Mother and Father's home. Beginning October 2013, supervised visits were moved back to the Agency office to occur one hour weekly. From October 2013 through March 2014, visits were offered at the Agency. On April 11, 2014, the Agency filed a petition for involuntary termination of Mother's and Father's parental rights. A hearing was held on the petition [on] May 14, 2014. The following is a summary of the evidence presented at the hearing.

Jessica Baumgardner from [the Agency] testified that A.B. came into the Agency's care after Mother and Father signed a Voluntary Placement Agreement when a paternal aunt stated that she could no longer care for A.B. and his older sibling, T.B., in her home on a safety plan. Mother and Father's parental objectives included: Mother will have her mental health needs assessed and met; Mother will attend empowerment classes at the Abuse Network and exhibit skills learned; Father will attend the Batterers' Group to address any controlling behaviors; Mother and Father will not resort to physical punishment as a means of discipline; Mother and Father will be open and honest with each other by freely discussing their marital relationship; Mother and Father will have sufficient income and appropriate housing; Mother and Father will demonstrate proper parenting skills which will meet the educational, physical, emotional, and developmental needs of A.B.; Mother and Father will participate with FICS Family Preservation Services; Mother and Father will undergo psychological evaluation with David Ray[, a licensed psychologist]; and Mother and Father will cooperate with all service providers.

With regard to addressing her mental health, Mother failed to attend intake assessment appointments at Universal Community Behavioral Health on January 17, 2011; February 9, 2011; April 26, 2011; and June 1, 2011. Mother attended intake assessment appointments on July 29, 2011 and August 17, 2012 but expressed both times that she did not need any services. Again, Mother failed to show for an intake assessment on September 28, 2012. Finally, on October 12, 2012, Mother attended and agreed to work on the board category of stress management. Between November of 2012 and April of 2013, Mother attended just six therapy sessions. She cancelled two and no[-]showed for one. Mother was discharged from therapy on April 18, 2013, because Mother continued to deny having any problems and there was nothing to work on in therapy.

With regard to addressing empowerment classes, Mother failed to attend intake assessment appointments with empowerment classes at the Abuse Network on April 7, 2011; April 14, 2011; April 19, 2011; and April 27, 2011. Mother did attend an intake appointment on April 27, 2012, but Mother only signed a limited release so the Agency was unable to obtain any information from the Abuse Network.

- 3 -

With regard to Father addressing controlling behaviors, he did attend an assessment at Batterer's Group after initially refusing to do so for six months. He did not meet the criteria. However, the Agency continued to witness Father exhibit controlling behaviors in the home.

With regard to Mother and Father refraining from physical punishment as a form of discipline, [an objective added] based on numerous referrals to the Agency alleging that Mother and Father slap[ped] A.B.'s face and bottom and bruising associated with physical punishment, there has been no evidence of physical discipline being used.

In an effort to address their marital relationship, Mother and Father attended twenty hours of marriage counseling with Reverend Robert Cash but since that time have been unable to identify any positive changes in their marriage and neither has Reverend Cash.

With regard to income and housing, Father has had steady employment and Mother has had various jobs but quit her last employment on July 6, 2012, under the belief that the Court directed her to quit her job to concentrate on her parental objectives. Mother and Father share a two-bedroom apartment that [is] provided to Father by his employer. Mother has moved out of the family home and returned five times within the duration of this case.

With regard to demonstrating proper parenting skills to meet A.B.'s needs, Mother and Father threaten to punish A.B., but never follow through. They have failed to set limits, rules or boundaries to establish structure in their home and they do not actively engage with A.B.

Chuck Peffer, Program Director at FICS, testified that FICS Family Preservation Unit was open with the family from on or about July 3, 2010, until on or about September 20, 2011. FICS Family Preservation Unit offered parent education, counseling, and crisis intervention. The Family Preservation Unit closed services based on Mother and Father making minimal progress.

Mindi Crownover, Program Director at FICS, testified that reunification services opened with the family December 18, 2011. At the time FICS conducted its intake assessment, it noted a history of potential domestic violence and relationship concerns; lack of rules and consistency in parenting;

argumentativeness and resistance to services; failing to follow through with meeting A.B.'s emotional needs and recommendation for therapy; concerns exist that Father's anger could lead to the possibility of hitting Mother and A.B.; concerns about Mother's mental health stability and physical health; older sibling has a history of threatening A.B.'s safety as well as Mother's safety; and Mother and Father failing to cooperate with FICS Family preservation or the Agency.

Concerns and issues observed by FICS from December 2011 until the Permanency Review Hearing on July 6, 2012, when the Agency requested a modification in A.B.'s placement, were that A.B. ignored Mother's directives; Mother and Father failed to have A.B. attend his counseling sessions; A.B.'s behaviors were regressing; A.B. was observed grabbing, pulling Mother's hair; threatening to kill, kick, or hit Mother and actually hitting and biting Mother.

Initially, Mother and Father were resistant to the services being offered by FICS. Even after Mother and Father indicated a willingness to cooperate, they failed to implement the parenting techniques that were provided by FICS. During their involvement with the family, FICS observed conflict between A.B. and his older sibling, T.B. A.B. reported on numerous occasions that T.B. would physically abuse him. Mother and Father blamed A.B. for these incidents. A.B. alleged that Mother and Father told him to lie about these incidents because if he [did not], he would be jeopardizing older sibling T.B.'s return home as well as A.B.'s return home.

When FICS closed their case, they had provided a total of 1,256.5 hours of service. FICS' assessment at closing noted: Mother and Father's resistance to services; Mother and Father's failure to implement feedback and recommendations; Mother and Father reporting that A.B. needed [to be] fixed and that he had to make changes; Mother and Father's inconsistency with house rules and consequences; A.B.'s fear of his older sibling, T.B.; Mother and Father telling A.B. to lie; and Mother and Father being unrealistic and lacking of insight into the needs of A.B.

The Agency referred this case to psychologist David Ray for an evaluation as to Mother and Father's psychological functioning, parental capabilities, and an assessment of the bond between Mother and Father and A.B.

Mr. Ray submitted his report to the Agency. It consisted of results from clinical interviews; the Wechsler Adult Intelligence Scale-4th Edition; the Wide Range Achievement test-3rd Revision; the Minnesota Multiphasic Personality Inventory-2 ("MMPI"); the Millon Clinical Multiaxial Inventory-III ("Millon"); the Parent Sentence Completion Blank; the Draw-A-Person test; and during interview, some questions from the Parent Assessment of Skills Survey. Mr. Ray testified as to his findings and recommendations.

The testing and interviews performed by Mr. Ray show Mother to function in the borderline range of intelligence. The complete results from the Wechsler Adult Intelligence Scale-4th Edition suggest Mother's thinking is concrete, her logic simple and her judgment fair. Mother's results on the Achievement test suggest her reading and spelling are an eighth grade level and she does arithmetic at a fifth grade level. The validity configuration on the MMPI revealed a marked elevation on the Scale L indicating that Mother would be denying most of the most common and obvious human faults and present with an intense need for a good front and does so with rigidity, repression, and denial. Mother's test result on both Millons had a markedly high elevation on the desirability scale which suggests that Mother views herself as having no problems. Also, the testing revealed a marked elevation on the compulsive scale which suggests Mother is extremely rigid as well as denying any type of psychiatric stress and denying any type of hostility. Further, the testing revealed elevations on the Histrionic and Narcissistic Scales which suggest Mother is egocentric, somewhat extroverted, can be demanding, has strong dependency needs, and is lacking in empathy.

Mr. Ray's opinion from the overall evaluation indicates that Mother manifests a diagnosis of Personality Disorder NOS-Mixed. Mother's personality disorder encompasses elements of narcissistic traits, with histrionic traits, compulsive traits and passive-aggressive traits. These traits negatively impact Mother's capacity to parent in a variety of ways. As a result of Mother's narcissism, she lacks the ability to put herself in A.B.'s shoes and feel what he is feeling and think what he is thinking. Mother's histrionic traits cause her to need to be the center of focus in problem situations as opposed to A.B. and her needs would override A.B.'s needs. Mother, as a result of her compulsiveness as it related to parenting A.B., sees everything as her way or the highway. Mother thinks everything is black

and white. Mother's passive aggressive traits make it difficult for her to take responsibility for her actions and she sees herself as a victim using denial, rationalization, and projection of blame as key defense mechanisms.

Based on the above, Mr. Ray concluded that Mother lacks the capacity to parent. Further, he knew of no other services that could provide assistance to Mother to help with her parenting abilities beyond those she had already received.

The testing and interviews performed by Mr. Ray show Father to function in the borderline to low average range of intelligence. Father's results on the Wide Range Achievement Test-Revision 3 suggested that academically Father functions on the sixth grade level. Father's results on the MMPI had a validity configuration with a marked elevation on the lie scale, Scale L, which can reflect an over-controlled, rigid, and repressed individual lacking in insight as well as an attempt to look extremely virtuous. Father's results on the Millon revealed a significant elevation on the desirability scale suggesting that Father portrays himself in a positive light. Also, there were elevations on the histrionic, narcissistic, and compulsive scales. This would suggest a lack of empathy, and individual who is dramatic and rigid.

Based on Mr. Ray's evaluation, it was Mr. Ray's opinion that Father manifests a diagnosis of Personality Disorder NOS with manifestation of passive aggressive traits, narcissistic traits, compulsive traits, and histrionic traits. These traits affect cognition, affectivity, interpersonal functioning, and impulse control. This will affect the way Father parents in that he is going to have a decided lack of empathy, he is going to have a great deal of difficulty accepting rules, regulations, and requests of other people. He is going to see it his way or no way. Father will be very dramatic.

Based on the above, Mr. Ray concluded that Father lacks the capacity to parent. Further, he knew of no other services that could provide assistance to Father to help with his parenting abilities beyond those he had already received.

Trial Court Opinion ("T.C.O."), 8/14/2014, at 1-8 (citations to notes of testimony omitted; minor changes to punctuation and capitalization).

Following the May 14, 2014 hearing, on August 14, 2014, the trial court issued its order that terminated Mother's and Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (a)(5), (a)(8), and (b). On September 15, 2014,[1] Parents filed a joint notice of appeal and a concise statement of errors of complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Parents present two issues for our review:

1. Did the trial court err in ordering involuntary termination of parental rights under 23 Pa.C.S. § 2511(a)(2), (a)(5) and (a)(8) when there was a lack of clear, convincing and sufficient evidence, where the parents' capability to properly parent the subject child was amply demonstrated by the successful return to parents of the subject child's sibling, who suffered from serious mental, emotional and behavioral problems?

2. Did the trial court err in ordering involuntary termination of parental rights per 23 Pa.C.S. § 2511(a), (b) as serving the child's needs and welfare when there was a lack of clear, convincing and sufficient evidence that severing the child's bond with his parents and sibling was in the child's long-term best interest?

Parents' Brief at 3.

In reviewing an appeal from the termination of parental rights, we review the order in accordance with the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for

_____

[1] The thirtieth day after the order was entered was September 13, 2014, which fell on a Saturday. Therefore, the notice of appeal filed on the following Monday, September 15, 2014, was timely.

- 8 -

termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *In re: R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion). As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.* Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

* * *

[E]ven where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (citations modified; some citations omitted).

Requests to have a natural parent's rights terminated are governed by 23 Pa.C.S.A. § 2511, which provides, in pertinent part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary

- 9 -

for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical, and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

This Court has explained the proper analysis for a termination petition, as follows:

> [U]nder Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only after determining that the parent's conduct warrants termination of his or her parental rights must the court engage in the second part of the analysis: [the] determination of the needs and welfare of the child under the standard of best interests of the child. Although a needs and welfare analysis is mandated by the statute, it is distinct from and not relevant to a determination of whether the parent's conduct justifies termination of parental rights under the statute. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child.

*In re Adoption of C.L.G.*, 956 A.2d 999, 1004 (Pa. Super. 2008) (*en banc*) (citations omitted).

In order to affirm the termination of parental rights, this Court need only agree that grounds for any one subsection of section 2511(a), in addition to subsection (b), have been established. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Therefore, although the trial court found grounds to terminate pursuant to multiple subsections, we will only address section 2511(a)(2) and (b).

It is well-settled that a party seeking termination of a parent's rights bears the burden of proving the grounds by clear and convincing evidence, a standard that requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction,

without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004) (citation omitted). To terminate parental rights pursuant to section 2511(a)(2), the following three conditions must be met: "(1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (citations omitted).

A variety of issues, including lack of parenting capacity, abuse, mental health concerns, an unstable parental relationship, and an inability to meet A.B.'s needs, brought Parents before the trial court. Mr. Ray testified that Mother was unclear why A.B. had been removed and denied that A.B. had any emotional problems. Notes of Testimony ("N.T."), 5/14/2014, at 14. Mr. Ray also testified that Mother lacked the capacity to parent A.B. and was unlikely to improve her parenting through additional services. *Id.* at 23-24. Similarly, Mr. Ray stated that Father also did not know why A.B. was in foster placement or what issues A.B. had. *Id.* at 26. Mr. Ray also opined that Father did not have the capacity to parent and that additional services would not improve Father's parenting. *Id.* at 31-32. There was evidence that T.B. would physically assault A.B. *Id.* at 105, 140. Despite denying that A.B. had problems, Parents would blame A.B. for T.B.'s behavior. *Id.* at 145-46. FICS workers also observed issues with Mother's mental health,

including anxiety and depression. *Id.* at 107. Mother never addressed those issues adequately. *Id.* at 178-79. The marriage was unstable with reports of abuse and Mother spoke of her intention of leaving the relationship. *Id.* Mother separated from Father five times between January 2012 and February 2014. *Id.* at 182. When A.B.'s aggression began to increase, Parents did not address the issue and did not follow through on counseling for A.B. *Id.* at 128-29.

The testimony demonstrated that these concerns continued throughout A.B.'s dependency. Mr. Ray testified that, as he observed the case, Mother and Father were not cooperating with the services that were offered to them. N.T. at 75. Mother and Father also refused to admit that they had problems or needed any help. *Id.* at 76. Parents cancelled appointments and made minimal progress toward their objectives. *Id.* at 108. After fifteen months of services, Parents still were unable to identify the children's emotional needs or motives. *Id.* at 115. Further, these concerns caused A.B. to be without proper parental care. Finally, the testimony supported the trial court's conclusion that these concerns have not been, and would not be, remedied. There was ample evidence to support the trial court's finding that the Agency proved by clear and convincing evidence that the Parents' parental rights should be terminated pursuant to subsection (a)(2).

Having concluded the trial court did not err in finding the evidence sufficed for subsection (a)(2), we turn to the second part of the analysis, subsection (b). In reviewing the trial court's decision regarding the needs

and welfare of the child, we consider that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The trial court must consider the nature and status of the parent-child bond, particularly the effect upon the child of permanently severing that bond. *Id.* "[A] parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

Here, the evidence supported the trial court's conclusion that terminating Parents' rights best served A.B.'s needs and welfare. Mr. Ray opined that Parents were not able to meet A.B.'s psychological or emotional needs or provide him with a healthy, nurturing environment. N.T. at 48. Mr. Ray testified that A.B. did not have a strong bond with or secure attachment to Mother or Father because A.B.'s emotional needs were not met by either of them. *Id.* at 52-53. While Mr. Ray acknowledged that A.B. would experience some difficulty if the Parents' rights were terminated, he opined that A.B. would be able to recover and thrive, although counseling was recommended to ease that transition. *Id.* at 98-100. Further, Mr. Ray testified that the benefits of permanency would outweigh the difficulties that A.B. might have due to the termination of parental rights and the end of his

relationship with T.B. *Id.* at 55-57, 101. A.B. has expressed to numerous people that he wants to be adopted. Mr. Ray opined that, even though A.B. later said he wanted to return home, A.B.'s true desire is to be adopted. *Id.* at 88-89. Based upon this testimony, the trial court did not err in concluding that the Agency met its burden to demonstrate that termination of parental rights was in A.B.'s best interest.

Finally, Parents argue that T.B. being returned to their care proves that they are capable of parenting and the Agency could not prove that their rights to A.B. should be terminated. However, we have held in a similar case in which one child was returned to the home, but one child was not, that "evidence concerning a parent's ability to care for another child is irrelevant and inadmissible in a proceeding to terminate parental rights with regard to the child at issue." *In re A.L.D.*, 797 A.2d 326, 338 (Pa. Super. 2002); *see also In re Baby Boy S.*, 615 A.2d 1355, 1362 (Pa. Super. 1992) ("Our supreme court has found that evidence of a mother's ability to care for a second child is irrelevant where her capability with regard to the first baby is in question." (citing *Matter of Adoption of G.T.M.*, 483 A.2d 1355 (Pa. 1984))). Therefore, regardless of Parents' ability to care for T.B., the trial court could not consider it in its determination of whether termination of parental rights was best for A.B.

Order affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/6/2015